COMMERCIAL NAT. BANK OF SALT LAKE CITY et al. v. BRINTON et al.

No. 2466.    Decided August 11, 1914.    On Application for Rehearing January 2, 1915 (145 Pac 42).

1.  PARTNERSHIP—ACTIONS—EVIDENCE—DISSOLUTION.  In an action on a note and deed of trust given to secure a partnership debt, evidence *held* to show the dissolution of the partnership before the obligations matured.  (Page 271.)

2.  BANKS AND BANKING—DEPOSITS—APPLICATION TO DEBTS.  Where a bank applied a debtor's balance to the payment of notes before they matured, and marked such notes paid, delivering them to the debtor, they were paid and discharged; the act of the bank being in accordance with the understanding of the parties.  (Page 272.)

3.  PARTNERSHIP—DISSOLUTION—EFFECT OF.  To procure capital, one member of a partnership executed a deed of trust to a bank to secure specified advances.  Thereafter the partnership was dissolved, and subsequently firm notes for the advances were paid out of partnership funds deposited with the bank by the remaining partner.  *Held* that, having been paid, the remaining partner could not renew the obligations; the deed of trust making no provision for such renewal or that it should secure any except the stated obligations.  (Page 272.)

Com. Nat. Bk. of Salt Lake City et al. v. Brinton et al., 45 Utah 265.

On Application for Rehearing.

4.  MORTGAGES—PAYMENT—WHAT CONSTITUTES—EVIDENCE. In an action on a mortgage given by a retiring partner to secure firm notes, evidence *held* to show that the notes, which were marked "Paid," were discharged, and were not merely canceled upon the giving of renewal notes. (Page 280.)

5.  MORTGAGES—PAYMENT—WHAT CONSTITUTES. Before retiring, one member of a firm gave a mortgage to a bank to secure firm notes. Thereafter all of the notes, save the fifth, were discharged, and it was extended. Meanwhile the remaining partner procured other advances from the bank, and when the fifth note became due the amount thereof was deducted from his balance, and the note marked "Paid" and surrendered. *Held*, that the fifth note was discharged, notwithstanding at the time of the transaction the remaining partner was indebted to the bank in an amount exceeding his balance, and that he thereafter incurred other indebtedness. (Page 282.)

Appeal from District Court, Third District, *Hon. C. W. Morse*, Judge.

Action by the Commercial National Bank of Salt Lake City and another, against David B. Brinton and others.

Judgment for plaintiff for partial relief. Plaintiffs and defendants appeal.

AFFIRMED on plaintiff's appeal and reversed and remanded with directions on that of defendants.

*Pierce, Critchlow & Barrette* and *D. W. Moffatt* for plaintiffs and appellants.

*Smith & McBroom* for defendants and appellants.

PLAINTIFFS' POINTS.

The mortgage as against subsequent incumbrances becomes a lien for the whole sum advanced from time of this execution, and not for each separate account advanced from the time of such advancement, although the right to enforce the collection thereof can only arise upon each advancement being made. (*Ackerman* v. *Hunsicker*, 85 N. Y. 43; *Shirras* v. *Craig*, 7 Cranch. 34; *Moroney's Appeal*, 24 Penn. St. 372;

*Tapia* v. *Demartini,* 77 Cal. 383.) If a note secured by a mortgage be renewed or otherwise changed, the lien of the mortgage continues until the debt is paid. Changes in the form of the instrument are immaterial.. Equity regards only the substance of things, and deals with human affairs upon that principle. (*Jones* v. *Guaranty Co.,* 101 U. S. 633; 27 Cyc. 1410, and cases there cited; *Heively* v. *Mattison,* 6 N. W. 732; *Arlington Mill Co.* v. *Yates,* 77 N. W. 77.) If neither the debtor nor creditor has made the application of the payments, the court will apply them to the debts for which the security is most precarious. (*Field* v. *Holand,* 6 Cranch. 8; *The Katie O'Neil,* 65 Fed. 111; See also foot note to *Blake* v. *Sawyer,* 12 L. R. A. 712.)

### DEFENDANTS' POINTS.

When a firm is dissolved and one of the partners takes the assets and assumes the liabilities, the other partner thereafter occupies the position of a surety, not only as between the partners themselves, but as to all others who have had dealings with the firm to whom notice of the new contract has been brought. (*Miller* v. *Thorne,* 56 N. Y. 402; *Preston* v. *Garrard,* 120 Ga. 689; *Wiley* v. *Temple,* 85 Ill. App. 69; *Smith* v. *Sheldon,* 35 Mich. 42; *Porter* v. *Baxter,* 71 Minn.. 195; *Barber* v. *Gillson,* 18 Nev. 89; *Rouse* v. *Bradford Baking Co.,* A. C. 586.)

A partnership creditor, who, with knowledge of an agreement between the partners upon dissolution by which one assumed the partnership debts thus establishing the relation of principal and surety between them makes a valid agreement with the assuming partner to extend the time of payment of his debt, thereby discharges the other partner. (*Miller* v. *Thorne,* 56 N. Y. 402; *Morrison* v. *Perry,* 11 Hun 33; *Dodd* v. *Dreyfus,* 17 Hun 600; *Wiley* v. ·*Temple, supra;* *Oakley* v. *Pasheller,* 4 Clark & F. 207; 10 Bligh, N. R. 548, commented on in 9 L. R. A. N. S. 88.)

### STATEMENT OF FACTS.

This is an action on a promissory note dated May 8, 1906, for $15,000, and to foreclose a trust deed given on real estate. to secure its payment.

The transactions out of which this controversy arose, briefly stated, are: In the early part of 1906 (the exact date is not shown, nor is it material), H. D. Page, of Boise, Idaho, and David B. Brinton, of Salt Lake County, Utah, entered into a copartnership to contract for and do construction work on a United States Government irrigation project, known as the Boise-Fayette project, in the State of Idaho. The partnership, doing business as Page & Brinton, entered into a contract with the United States Government to do the construction work mentioned. It needed money to carry on the work and to pay its running expenses until payments, in the form of United States Treasury warrants, were made by the Government under the terms of the contract and as the work progressed. Page entered into negotiations with the plaintiff bank through its cashier, H. P. Clark, for a loan of $15,000. The bank required security. A few days thereafter Page and Brinton went to the bank to arrange for the loan. Clark made a memorandum of Brinton's property and designated certain pieces of real estate as satisfactory security for a loan of $15,000. A note for that amount was signed by David B. Brinton and his wife, Susan Brinton, and by Page & Brinton. A trust deed was executed by the Brintons as security for the payment of the note. Clark, a witness for the bank, testified regarding the transaction in part as follows:

"When it came to fixing up the loan, Mr. Page stated that he would not need all the money at one time. He wanted to have the matter arranged so that the interest would not begin until they needed the money. I stated that could be arranged by holding the Brinton $15,000 note and the trust deed as collateral security and executing other notes to the bank in different denominations which could be used from time to time as required. The four notes dated May 4th and the note dated May 15th (19th), making a total of $15,000, were executed in different denominations under that agreement. The five notes and the one note represented only the same loan, and they were left with the bank."

The respective amounts for which the five smaller notes were executed were: $4,000, $2,000, $5,000, $2,000, and

$2,000.  Blank spaces were left on these notes for the inser-
tion of the dates when they should begin to draw interest
and become effective.  They were signed by Hubert D. Page
and David B. Brinton and were left with the bank to be
placed to the credit of Page & Brinton as needed.  Prior to
the time any of the fund represented by the notes was placed
to the credit of Page & Brinton, and before the partnership
began work under its contract with the Government, Page
after consulting with Clark in relation to the matter, pur-
chased Brinton's interest in the partnership business for the
sum of $6,000.  It was understood that Page should enter
upon and complete the construction work in his own behalf
but in the partnership name.  The agreement dissolving the
partnership was reduced to writing and signed by Page and
Brinton.  The agreement, so far as material here, provides
that:

"The execution of this agreement shall in no wise change
*    *    *    any liabilities heretofore assumed by the said
firm of Page & Brinton, or either member thereof, under
such Government contracts aforesaid; nor shall this agree-
ment in any way affect the loan heretofore secured from the
Commercial National Bank of Salt Lake City."

Prior to the execution of this agreement, Page informed
Clark, through whom the partnership transacted most of its
business with the bank, that he had purchased Brinton's in-
terest in the partnership business.  Brinton, about this time,
also informed Clark that he had sold out to Page.  The bank,
therefore, had notice of the dissolution of partnership.  On
different dates between May 19 and July 23, 1906, the pro-
ceeds of the five notes referred to were, at the request of
Page, placed to the credit of the account of Page & Brinton.
During the month of August, 1906, drafts aggregating $27,-
285.13 from the United States Treasury, remittances on the
construction work, were deposited by Page in the bank and
were credited to the account of Page & Brinton.  The bank
on August 28, 1906, canceled four of the notes mentioned
and charged the amount, which aggregated $13,000, to the
account of Page and Brinton, leaving a credit balance of
$2,400.26.  The other note for $2,000, which, with the balance

270        SUPREME COURT OF UTAH.        [Jan.

Com. Nat. Bk. of Salt Lake City et al. v. Brinton et al., 45 Utah 265.

of the canceled notes, was introduced in evidence, contained a notation made in lead pencil, ''Extended to Feby. 2, 1907,'' and was stamped ''Paid'' February 14, 1907, with the bank's cancellation stamp. The word ''Paid'' was also perforated in the note. From August 28th, the date on which the four notes were paid and the amount charged to the account of Page & Brinton, to and including November 25, 1906, the account at different times showed an overdraft; at other times a credit balance. On November 19, 1906, the account showed an overdraft of $12,455.33. On November 20th, Page, in order to take care of this overdraft, gave the bank three notes, to which he signed his own name as well as the firm name of Page & Brinton. These three notes aggregated $13,000 and bear date November 3, 1906. On April 11, 1907, they were stamped ''Paid'' by the bank. The word ''Paid'' was also written across the face of the notes in red ink. It is contended on behalf of the bank that these notes were ''renewal notes,'' and that they were given by Page in lieu of the four notes signed by Brinton personally, and canceled by the bank August 28, 1906, and charged to the account of Page & Brinton. During the month of April, 1907, Page, in order to balance his overdraft at the bank, executed seven notes in the name of Page & Brinton, aggregating $31,000. It does not appear which, if any, of these notes are claimed to be ''renewal notes'' and given in lieu of the three notes last mentioned. The seven notes were, however, on different dates between May 27 and July 27, 1907, stamped ''Paid'' with the bank's cancellation stamp. On different dates between August 27, 1907, and January 24, 1908, Page executed notes to the bank for various sums, amounting in all to $83,000, all of which were stamped ''Paid'' by the bank on or about the dates on which they matured.

Again referring to the five notes first placed to the account of Page & Brinton, the court found that the indebtedness ($13,000) evidenced by four of these notes had been paid, but that the indebtedness evidenced by the note for $2,000, which was canceled by the bank February 14, 1907, has not been paid, and rendered judgment against Brinton

for the principal ($2,000) and accrued interest.  Both parties appeal.

McCARTY, C. J. (after stating the facts as above).

We think the contention made on behalf of the bank that the firm of Page & Brinton was not dissolved is against the undisputed evidence and admitted facts and is untenable.  Page testified on this point, in part, as follows:

"About the 22d day of May, 1906, I went to the bank with respect to this dissolution of the partnership. * * * The business I did was with Mr. Clark, the cashier.  I asked him what he thought about it.  He said: 'Buy Mr. Brinton out.'  He said he would advance the money through the Commercial National Bank to buy Mr. Brinton out. * * * I paid Mr. Brinton $5,000 on account of the partnership. I got $4,000 of this money from the Commercial National Bank.''

Brinton testified:

"The $4,000 was paid me by Page in his office in Salt Lake City.  It was paid the same day the contract [referring to the contract of dissolution] was made, or perhaps the next day. * * * When I was in the bank after the 22d of May, I told Mr. Clark that I had sold out to Page, and he said that he and Page had talked about it. * * * He seemed to know all about it.''

Clark testified:

"Page came into the bank and stated that Mr. Brinton was involved in his subcontracts upon the Cottonwood conduit, needed money to pay off his laborers, and that Page believed he could buy out Brinton's interest in the Boise project on account of his embarrassment at that time.  Subsequently he told me that he had bought Brinton's interest in the profit of the contract.''

We think this evidence, considered in connection with Brinton's failure to thereafter take any part in the management of the business or transactions entered into by Page in the name of Page & Brinton, and Page's assumption of

the entire control of all the assets of the firm and conduct
and management of the business as his own, clearly estab-
lishes the dissolution of the partnership.  30 Cyc. 603, 604.

The next question presented is:  Was the trust deed in-
tended as security for the payment of only the specified
$15,000 loan as represented by the five notes given at
the time it was executed, or was it intended to secure  **2, 3**
the payment of any and all loans or advances, not ex-
ceeding $15,000, the bank might make Page & Brinton, and to
include any loan or advance made after the payment and can-
cellation of the five notes executed contemporaneously with
the deed?  It is vigorously contended on behalf of the bank
that the note of $15,000 and the trust deed were, when exe-
cuted, intended to be left on deposit with the bank as se-
curity for any loan Page & Brinton might thereafter obtain,
or that might be obtained by either member of the partner-
ship in the firm name, and that, when the five notes repre-·
senting the loans for which they were given should be paid,
other notes for additional advances should be given and
deemed secured by the original note of $15,000 and the
trust deed.  On the other hand, it is contended that the note
for $15,000 and the five notes evidenced but one and the
same indebtedness, to secure which the trust deed was given,
and that it was not intended and was not given to secure
any other indebtedness.  It is admitted the real indebtedness,
to secure which the trust deed was given, was as evidenced
by the five notes first placed to the credit of the account of
Page & Brinton.  The trust deed, so far as material here,
provides that:

"David B. Brinton and Susan Brinton, his wife,  *  *  *
grantors, convey and warrant to H. P. Clark, trustee,
*  *  *  grantee, for the sum of one dollar and in further
consideration of the debt hereinafter mentioned and the
trusts hereinafter constituted and set forth, the following
described tracts of land [describing the land].  *  *  *  In
trust, however, to said grantee and his successors for the
following purposes:  Whereas, David B. Brinton and H. D.
Page, as Page & Brinton, have borrowed of the Commercial
National Bank of Salt Lake City, Utah, the sum of $15,000,

payable on or before September 7, 1906, * * * said indebtedness being evidenced by one promissory note in the sum of $15,000. * * * Said note being executed by said David B. Brinton, Susan Brinton, Page & Brinton, H. D. Page, and bearing even date herewith, and being payable to the order of said * * * bank. * * * Now, if the said note and interest be well and truly paid as the same becomes due according to the terms of said note, * * * then this deed shall be void and the property hereinbefore conveyed shall be released at the cost of said grantors."

It will be noticed that there is nothing in the deed of trust from which it can be inferred that it was given or intended to secure any indebtedness other than the specific $15,000 loan therein mentioned. It contains no language which indicates any other intention, nor is there any evidence *dehors* the deed showing or tending to show, or from which it can be inferred, that the parties intended the trust deed to secure any indebtedness other than the one specific $15,000 loan. The evidence affirmatively shows that Page had no authority from the Brintons, or either of them, to enter into any agreement or contract with the bank to modify or extend in any particular any term or provision of the trust deed; nor did he, after the dissolution of the partnership, have any authority to bind Brinton by making or renewing notes in the firm name. It is a well-recognized rule of law:

"That, after a dissolution of a partnership, neither of the parties has implied authority to bind the firm or his copartners by making, renewing, or indorsing negotiable paper in the firm name, and this is true even though the obligation be given for a firm debt." 30 Cyc. 668.

As we have pointed out in the foregoing statement of the facts, four of these notes, amounting to $13,000, were paid by charging the amount to the account of Page & Brinton; and the undisputed evidence shows that the notes were stamped paid by the bank and delivered to Page. The notes were not paid by the execution of "renewal notes" representing the same indebtedness. It was more than two months after the four notes were paid before Page executed the three notes which the bank claims were given as renewal

Vol. 45—18

274        SUPREME COURT OF UTAH.        [Jan.

Com. Nat. Bk. of Salt Lake City et al. v. Brinton et al., 45 Utah 265.

notes for the indebtedness, as evidenced by the four canceled notes. And, as we have stated, the four notes secured by the deed of trust were paid (the indebtedness discharged) with money Page had to his credit in the name of Page & Brinton in the bank. Moreover, we think it clearly appears from the evidence that, at the time the trust deed and the notes secured thereby were delivered to the bank, Page and Brinton expected that the remittances they would receive from the Government on their work in the form of United States treasury drafts during the months of June, July, and August, 1906, would be sufficient to pay the notes and to carry on the construction work, and that there would be no necessity to continue the loan for the full length of time for which it was made. On this point Brinton testified, in part, as follows:

"At the time these five notes were signed, it was understood that treasury drafts would commence to come in in June, July, and August, and that would give us time to get the money to pay the notes."

Page testified:

"At the time Mr. Brinton signed the first note for $15,000, and those other notes, we requested to have those notes taken up and canceled. * * * No, not at that particular date, but whenever there was a surplus over and above the amount I required at different times."

On cross examination he testified:

"Q. It was understood Mr. Brinton would allow you to use the $15,000 capital that you had put into the business, wasn't it? A. Yes, sir. Q. And that was to give you money to carry on your transactions as you might need it until the surplus came in from the transaction with the Government, which would enable you to pay them off? This is correct, isn't it? A. Up to that date. Q. Up to September 4th? A. Yes. That seems to be the limit of the note."

True, Clark testified that:

"There was never any understanding that these notes should be paid and canceled as obligations of Page & Brinton

out of the first money that came from the United States. There was never any statement made as to the limit of time or the period of time during which they would need this accommodation by way of loan from the bank. The understanding was that they depended upon the progress of the work."

If there was no express or tacit understanding as to the time limit of the loan other than that fixed by the notes, then the time specified in the documents must control. The bank, however, by direction of Clark, and without consulting either Page or Brinton, canceled four of the notes more than two months before they matured, and charged the amount to the account of Page & Brinton. After these notes were paid, the Page & Brinton account showed a credit of $2,619.58. 'It therefore seems that Clark understood that the notes were to be paid when there was sufficient funds to the credit of Page & Brinton to cover the indebtedness. The court, therefore, did not err in finding that the indebtedness of $13,000, evidenced by the four notes that were stamped by the bank August 28, 1906, was paid and extinguished.

We think, however, that the court erred in holding that the indebtedness evidenced by the other note for $2,000, secured by the trust deed, which was stamped paid February 14, 1907, and surrendered by the bank to Page, had not been paid. The evidence of Clark clearly shows that the indebtedness represented by it was paid and extinguished. On this point he testified as follows:

"Q. Mr. Clark, calling your attention to the date of Page & Brinton's account on February, what was the credit balance on that date, 1907? A. The credit balance was $3,115.35. Q. And calling your attention to plaintiff's Exhibit E (the note in question), I will ask you when was that note paid off? A. February 14, 1907. Q. After the payment of that note, what was the credit balance? 'A. $555.81.''

The note having been finally paid, canceled, and surrendered to Page by the bank, and the debt evidenced by it extinguished, the question of whether the bank could, under the circumstances and after the dissolution of the partner-

ship, extend the time of payment without the consent or knowledge of Brinton becomes, so far as this case is concerned, unimportant. Counsel for the bank, in support of their contention that the trust deed was intended and was given to secure any advances that the bank might make in the shape of loans to Page & Brinton during the progress of the construction work under the Page & Brinton contract with the Government, cite and rely on the following cases: *Lawrence* v. *Tucker*, 23 How. 14; 16 L. Ed. 474; *Commercial Bank* v. *Cunningham*, 24 Pick. (Mass.) 270; 35 Am. Dec. 322; *Jones* v. *Guaranty & Indemnity Co.*, 101 U. S. 622; 25 L. Ed. 1030; *Schuelenburg* v. *Martin* (C. C.), 2 Fed. 747; *Courier-Journal, etc.*, v. *Schaefer-Meyer Brew. Co.*, 101 Fed. 699; 41 C. C. A. 614; *Ripley* v. *Harris*, 3 Biss. 199, Fed. Cas. No. 11,853. It will be seen, by an examination of these cases, that the instrument sought to be foreclosed in each of them expressly provided for the payment of not only a certain specified sum or sums of money, but for future loans or advances.

In *Lawrence* v. *Tucker* the mortgage was given "to secure a note * * * for $5,500, and such advances of money as there had been or might be made within two years, * * * not to exceed in all an indebtedness of $6,000," in addition to the sum for which the note was given.

In *Commercial Bank* v. *Cunningham* the mortgage was given, quoting the language of the court, "to secure the payment of large debts due to the demandants, and also to secure any future demands * * * against the Edgartons, so long as they should be under any liabilities of any sort to the demandants."

In *Jones* v. *Guaranty & Ind. Co.*, quoting from the statement of facts made by the court:

"The mortgage was conditioned for the payment * * * of the amount that might be due upon the instrument [a bond] secured by it. The bond is set out at length in the record. It states that it was given to cover any advances then made or thereafter to be made by the guaranty company to Cozxins to the amount of $100,000 or less."

In *Schuelenburg* v. *Martin,* the court, in stating the facts, said:

"The plaintiffs, who are dealers in lumber at St. Louis, Mo., agreed to furnish to said Kullak, who was engaged in the same business, * * * such quantities of lumber as he might order for a period of one year, on a credit of sixty days, provided no order for more than $5,000 worth of lumber should be made at any one time, and the indebtedness at no time during said year to exceed said sum of $5,000. To secure the payment of all bills or accounts for lumber ordered and delivered under this arrangement, the mortgage sued on was executed."

In *Courier-Journal, etc.,* v. *Schaefer-Meyer . Brew. Co.,* the mortgage contained the following provision:

"The condition of this conveyance and transfer is such that should said party of the first part well and truly pay off and discharge all claims, debts, and liabilities on which said parties of the second part, or any or more of them, may be bound as sureties as aforesaid or *may become hereafter bound* as sureties as aforesaid, to the amount of $25,000, within four years from the date hereof." (Italics ours.)

In *Ripley* v. *Harris,* the mortgage was given to secure the payment of a bond, which provided, among other things:

"For the payment to the said Van Slyke, or assigns, of all money due on any note or notes, drafts or acceptances, or other evidence of debt, that did *or might thereafter exist* against John Reynolds." (Italics ours.)

It will be noticed that each of the foregoing cases is clearly distinguishable from the case at bar. In each of those cases the mortgage expressly provided for the payment of future loans or advances up to a specified sum and within a specified limit of time, whereas in the case at bar the trust deed was executed to secure the payment of the specific $15,000, evidenced by the five notes mentioned. These notes were made payable five months from the time they were deposited and left with the bank. It was understood by and between the parties to the transaction that the partnership should be given credit at the bank for the several sums represented by the notes as the money should be needed by it in the prosecution of the construction work under the contract with the Government. There was, however, a time limit to the loan. This was fixed and made certain in the notes, and

there is nothing in the record that shows, or tends to show, that the trust deed was executed or was intended to secure the payment of any loan made by the bank to the partnership other than the five notes that were left with the bank at the time of the execution of the trust deed. Reference is made to certain statements made by Page and transactions entered into by him with the bank after the bank had notice of the dissolution of the partnership. It is argued on behalf of the bank that these statements and transactions tend to show that the trust deed was intended by the Brintons to secure the payment of any loan, not exceeding $15,000, that the bank might thereafter make to Page & Brinton. Page could not, after the bank received notice of the dissolution of the partnership, enter into any contract or incur any obligation with the bank that would be binding on Brinton, unless he had authority from Brinton to do so. That he had no such authority is clearly shown by the record. Page testified on this point as follows: "I had no authority to obligate Mr. Brinton." Brinton testified, and his testimony is not disputed: "I will state that the Commercial National Bank never consulted me, either orally or in writing, at any time with respect to the signing of any of those notes, nor with respect to the affairs of the concern of Page & Brinton at any time after the 22d of May, 1906; nor did they consult my wife."

It is ordered that the cause be remanded, with directions to the trial court to set aside the judgment and to so modify its findings and conclusions to conform with the views herein expressed, and to render judgment as prayed for by the defendants. Costs to the defendants.

STRAUP and FRICK, JJ., concur.

ON APPLICATION FOR REHEARING.

McCARTY, C. J.

Counsel for respondents have filed a petition for rehearing, in which they vigorously assail the conclusions arrived at in the foregoing opinion respecting the note for $2,000 which was stamped "Paid August 28, 1906." While counsel do

not directly assail that part of the opinion in which the judgment of the lower court as to the four notes that were paid August 28, 1906, is upheld, they nevertheless, in their discussion of the points presented by their petition, in effect challenge the correctness of that part of the opinion. We shall therefore briefly review the facts bearing upon the questions discussed and referred. to by counsel in their brief. Counsel say:

"This court in its opinion proceeds upon the assumption that it was the agreement and understanding that when the. five notes referred to in the findings were made by Page & Brinton they should be retired whenever the Government paid to Page & Brinton sufficient to cover the face and interest, and that since at one time prior to February, 1907, when this note No. 3649 was canceled by the giving of a new one, there was in the open account of Page & Brinton at the Commercial National Bank a credit in excess of $2,000, it should be regarded as paid, and that the fact that it was canceled in February, 1907, is in some manner evidence of the fact that the $2,000 was no longer secured by the original $15,000 note. This assumption is contrary to the only evidence upon the subject there is in the record, evidence which cannot be contradicted."

And they further say that for this court to attempt—"to give effect to a supposed oral agreement between the bank and Page & Brinton, made at the time the notes in question were executed in May, 1906, * * * would be to vary the terms of the promissory note as to its date of maturity by an oral agreement."

On this point Mr. Brinton testified:

"At the time these five notes were signed it was understood that the treasury drafts would commence to come in June, July, and August, and that would give us time to get the money to pay the notes."

Four of these notes were payable November 4, 1906, and the other note was made payable November 19th. On August 28th, three months after the dissolution of the partnership, and more than two months before the maturity of the notes, four of the notes, aggregating $13,000, were by the bank

canceled and the amount charged against the account of
H. D. Page, doing business as Page & Brinton. On this
point Mr. Clark, cashier, testified:

"In the month of August, 1906, $13,000 of the notes,
* * * 'Exhibits C, D, F, and G,' were—by my direction,
I think—charged into the account of Page & Brinton."

During the trial of the cause respondents introduced page
upon page of oral testimony endeavoring to show that the
mortgage in question was not only executed by the Brintons
to secure the notes mentioned, but was also intended (con-
trary to its terms) to secure the payment of any fu-
ture advancements that the bank might make to Page 4
& Brinton as needed by them in the prosecution of
the work under the contract with the Government. The
oral and printed arguments of respondents' counsel in their
first discussion of the case in this court were mainly devoted
to this phase of the controversy. It was vigorously con-
tended that the obligation represented by the notes and mort-
gage was never paid, but was continued in force by the
execution of "renewal" notes; that is, as the notes repre-
senting the obligation became due they were canceled, and
new notes executed in lieu of the canceled notes, and that
thereby the obligation became merged into the renewal notes.
Then, as now, counsel contended that the evidence, without
conflict, showed that the debt which the mortgage was given
to secure was carried along in this way, and never was in
fact paid. The undisputed facts referred to in our former
opinion, and the testimony there quoted, convinces us that
counsel have misconceived the evidence. The testimony of
Brinton and the voluntary act of the bank in canceling four
of the notes more than two months before maturity were not
referred to for the purpose of varying the terms of the notes
as to their dates of maturity, as counsel seem to imply, but
for the purpose of inviting attention to the circumstances
and conditions under which the notes were paid. We think
this clearly appears from the opinion. As stated, the four
notes referred to, Exhibits C, D, F, and G, were canceled by
the bank, and the amount ($13,000) charged to the open
account of Page, doing business as Page & Brinton, more

than two months before maturity. True, it appears from the record that on September 10, 1906, Page wrote to the bank, and, among other things, said:

"You will find, by looking up my account, that Mr. Brinton and myself signed notes for $15,000. Four thousand dollars, note of which I have since taken up, but the $11,000 should remain to my credit."

The bank, however, did not, on receipt of the letter, transfer the $11,000, or any part thereof, from the debit to the credit side of Page's account, but left the account in that regard as it was when the $13,000 was charged against it. The evidence shows that from the 1st of August, 1906, to the latter part of May, 1907, Page deposited, in cash and United States treasury drafts, over $90,000 to the credit of his account with the bank. Clark, the cashier, testified that of this amount $27,285.13 was deposited in August. Referring to Exhibits C, D, F, and G, he further testified:

"Exhibit C was paid on August 10th, the amount of the note, together with interest, $4,073.77, was charged to the account of Page & Brinton. It was charged out of the funds then at the bank to their credit. Exhibits D, F, and G, amounting to $9,000, were paid August 28, 1906, together with interest, and were paid out of the credit balance to their credit at that time. After the payment of these accounts on that date, the balance to the credit of Page & Brinton was $2,619.58."

Moreover, the undisputed evidence—the respondents' evidence—shows that no notes were executed by Page to the bank, either in his own name or in the name of Page & Brinton, after the dissolution of the partnership (May 22, 1906), until nearly three months after the four notes referred to were paid and two weeks after their due date. Clark testified that on November 19, 1906, Page had overdrawn his account at the bank $12,455.63, that on November 20th he executed notes to the bank for $13,000, which amount was placed to the credit of his account, and when the bank closed for the day Page's account showed a balance to his credit of $497.21. He also testified as follows:

"The fact is that in some cases notes were given and the

proceeds went into the account of Page & Brinton, and in other cases notes were given in direct renewal of notes theretofore existing without going from their account to the books. Some of these notes may have been taken to cover an overdraft, in which case they had already drawn the money, and the note would be taken and the amount credited to cover the overdraft."

It is therefore conclusively shown by respondents' evidence that notes were given to meet the overdraft, and were not intended as renewals of the four notes that were paid August 28th. It is idle for counsel to contend, in the face of the foregoing facts, none of which are disputed, that the four notes which were canceled August 28th and surrendered by the bank were paid by Page executing "renewal" notes.

We shall now consider counsel's discussion of what they claim were the circumstances and conditions under which the note for $2,000, referred to in the bill of exceptions as "Exhibit E," was canceled, and briefly review the evidence bearing on this phase of the controversy. Counsel, in their brief, say:

"The testimony * * * shows without possibility of contradiction that the note of $2,000 ran on * * * and no request of Page to charge it against the open account was ever made. * * * It is * * * perfectly apparent that there was no money at any time which was applicable to the payment of * * * the note, excepting as above stated by the renewal of February, 1907. * * * We contend * * * that there is not a particle of evidence in the record, and nothing in the entire case, which tends to contradict the finding upon the subject."

When this note, Exhibit E, became due, November 4, 1906, which was more than five months after the dissolution of partnership, time of payment was extended until February 2, 1907. This was done without the consent or knowledge of either Brinton or Mrs. Brinton. When the note came due it was by the bank canceled and the amount charged against Page's open account. This counsel for respondents seem to deny. Clark testified unequivocally that the note was paid by the bank charging it against the open account.

His evidence on this point is set forth in the foregoing opinion, to which we invite attention. True, Clark testified that the bank, at the time this note was taken up, held other notes executed by Page, the proceeds of which were credited to the open account, and that if these notes had been charged into the open account at the time Exhibit E was paid it would have created an overdraft in the account of several thousand dollars. This, however, in no way affected the transaction by which the note was charged against the open account. Neither is the question of whether Exhibit E was charged against the open account at the request of Page or whether the bank did it of its own volition important. The fact remains, as shown by the undisputed evidence adduced by respondents, that the note was charged against Page's open account. And there is not a scintilla of evidence in the record that shows, or tends to show, that the note was paid by the giving of a renewal note. When the note was canceled—stamped "Paid"—and surrendered to Page, and the amount thereof charged to the open account, the obligation, in so far as it affected the Brintons, was discharged. The only note executed by Page in February, 1907, was a note for $5,000. This note bore date of February 6th, and was payable April 7, 1907. This is the note referred to by counsel in their brief filed in support of the petition for a rehearing. It was executed by Page in the name of Page & Brinton. It was, however, his personal 'obligation. The Brintons were strangers to the transaction. The note, which is in evidence, shows that it was canceled—stamped "Paid" —April 7, 1907. The word "Paid" was also written across the face of the note in red ink.

Counsel contend that the obligation represented by Exhibit E was merged in this note for $5,000; that is, that the note, to the extent of $2,000, is a renewal note. This, however, is only an inference of counsel, which is unsupported by evidence. Moreover, we think it may be fairly inferred that if the bank had intended to continue to hold the Brintons liable for the payment of the debt represented by this particular note (Exhibit E) it would either have extended the time of payment with their consent or have had them

and Page execute a new note for the amount. Instead of pursuing either of these courses it charged the amount of the note against Page's open account. If this does not constitute payment of a note, it would be difficult to conceive of a transaction that would.

We have examined the record in this case with more than ordinary care, and we are clearly of the opinion that the decision of the lower court, wherein it is held that Exhibit E was not paid, is unsupported by evidence, and that the evidence without conflict shows that it was paid.

The petition for a rehearing is denied.

STRAUP, J.

On a further re-examination of the record I, too, think the petition should be denied. The case, as I view it, is this:

Page & Brinton, partners, to carry on their construction work in Idaho, made arrangements with the bank to borrow $15,000. A note for that amount was executed by them on May 8, 1906, payable on or before four months after date. To secure that, a trust deed was given by Brinton and his wife. No moneys were then paid, nor credit given, because of the understanding that none was to be paid or given until needed by Page & Brinton. To better facilitate that, the $15,000 note was split by Page & Brinton giving five other notes—one for $4,000, due November 19th, spoken of as Exhibit C; one for $5,000, due November 4th, Exhibit D; one for $2,000, due November 4th, Exhibit E; one for $2,000, due November 4th, Exhibit F; and one for $2,000, due November 4th, Exhibit G. It is conceded by both parties that the five notes, aggregating $15,000, were for the same indebtedness and purpose for which the first note was given.

Now, at the threshold, a controversy arises as to the purpose for which the notes were given. By the bank it is contended that they were given for any and all advances, not exceeding $15,000, which the bank might make to Page & Brinton, or to either of them, in carrying on the construction work; that is, if say $15,000 had been advanced in 1906, and subsequently repaid, and thereafter other advances, not exceeding $15,000, had been made, etc., the notes, and the trust

deed given to secure them, evidence such transactions and secured such advances, as well as a single and specific loan of $15,000. That is disputed by the defendants, who contend that the note and trust deed were given for but a specific and single loan of $15,000, and none other, and as evidenced by, and as appears on the face of, the notes and the deed themselves. That issue, upon all the evidence adduced, was found by the trial court in favor of the defendants and against the plaintiff. I think the finding is sufficiently supported, and is such as, on the record, ought to have been made.

The further question, then, is as to whether these notes were paid. Upon that issue the trial court found that all of them had been paid but one, the $2,000 note, Exhibit E, and accordingly granted foreclosure of the trust deed as to that note only. Upon a review of the record we held all the notes had been paid, and that the finding of the court of nonpayment of the $2,000 note, Exhibit E, was wrong. This holding particularly the bank by its petition has challenged, and contends is against the undisputed evidence. If the bank is right as to its first contention, that the notes were given for any and all future advances, not exceeding $15,000, that it might make to Page and Brinton, or to either of them, then is it right as to this. For then it would be no defense that the first or prior advances had been paid; the evidence indisputably showing that, when the transactions between the bank and Page closed, he, for advances made to him by the bank, owed it much more than $15,000. But, as already observed, the court found, and I think the finding justified, that the notes were not given for that purpose, but for a specific and single loan or indebtedness. Hence, from that viewpoint do I now consider the question of payment.

Page & Brinton were partners when these notes were given on the 8th of May, 1906. But that partnership was dissolved on the 22d of May of that year. True, there is a controversy as to that. I think, however, the evidence clearly shows the dissolution, and that the bank had full knowledge of it. The court made no finding as to that issue, evidently regarding it as immaterial. I think it material, and further

think that, on the evidence, there is as to that but one finding justifiable, and that is a finding of dissolution, and that the bank at the time had full knowledge of all the terms and conditions of the agreement of dissolution. By that dissolution Page alone acquired and succeeded to the whole of the partnership property and business and to all of the proceeds derived therefrom. What he did thereafter was, hence, not as a partner, but for himself, in his individual capacity. It was agreed, however, that he might continue the business in the name of Page & Brinton, and, further, that "this agreement shall not in any way affect the loan heretofore secured from the Commercial National Bank of Salt Lake City," the plaintiff. The agreement of dissolution was in writing, and at the time of its execution was exhibited to the bank. Of course, the dissolution could not, and did not, affect the prior obligations assumed or incurred by the partnership, and did not affect the loan the bank theretofore had made to Page & Brinton. The dissolution, however, is material as it concerns the future dealings between the bank and Page. And that is material as bearing upon the question of payment of the notes.

Between May and July, 1906, the whole amount of the five notes, $15,000, was placed to the credit of Page & Brinton at the bank subject to check. Page, in August of that year, from moneys received by him from the Government, also deposited to his credit, in the name of Page & Brinton, over $27,000, of which over $8,300 were deposited on the 10th, over $15,300 on the 24th, and $3,600 on the 29th, of August. So, on the 10th of that month, the $4,000 note, Exhibit C, was charged against the account, the note by the bank stamped "Paid August 10, 1906," and then surrendered and delivered to Page. On August 28th the $2,000 note, Exhibit G, the $5,000 note, Exhibit D, and the $2,000 note, Exhibit F, were likewise charged against the account, the notes by the bank marked and stamped "Paid August 28, 1906," and then surrendered and delivered to Page. That was a total of $13,000 of the $15,000 loan. After thus charging that amount against the account, there still remained a balance credit, on the 29th of that month, of about $2,400. It will

be observed that these notes were not then due—one of them not until November 19th, the others not until November 4, 1906. The bank's officer having charge of the matter himself testified that those notes, Exhibits C, D, F, and G, were, under his direction, charged against the account on the dates indicated. Page, when he learned that, claimed that only the $4,000 note, Exhibit C, should so have been charged, and that the remaining $11,000 should have remained to his credit. But I do not find anything to show that the bank acquiesced in that, or in any particular modified the charge which theretofore was made under the direction of the bank's officer.

The remaining note of $2,000, Exhibit E, was not then paid. It also was due November 4th. Payment of it without the knowledge or consent of Brinton was extended until February 2, 1907. On February 14, 1907, it also was, by the bank, marked and stamped "Paid February 14, 1907," and then also was surrendered and delivered to Page. Now, the claim made is that it in fact was not paid, but was merely renewed by the giving of another note, or included in other notes, given by Page. As to that but two witnesses testified— Page for the defendants, and the bank's officer for the plaintiff. Page testified:

"The note, Exhibit E, for $2,000, was paid, but I do not remember just how it was paid. I presume it was charged to my account. I don't know that it was paid by giving a new note, but I don't think so. I was getting money from the United States Government every month. The bank was getting money from my treasury drafts, and I don't just know how they applied it."

The bank's officer, who had conducted all the business between the bank and Page and Page & Brinton, testified:

"On February 15, 1907, the account (Page & Brinton) showed a credit balance of $3,115.35. The plaintiff's Exhibit E was paid, and on February 14, 1907, and after the payment of that note, there was a credit balance of $555.81."

The testimony of these witnesses, together with the presumption of payment from the bank itself marking and stamping the note "Paid" and surrendering and delivering

it back, is good proof that it was in fact paid. Not only is it good, but also of such weight, coming as it does from those who transacted the business, and hence knew what the fact in such respect was, as to require something equally clear and strong to overcome it. I find no direct evidence against it. I therefore look to see what, if any, indirect evidence there is bearing on the question. From the 1st of September to the 29th, the account was continually overdrawn. The overdrafts gradually increased until the 27th, when the overdraft was $8,497.01; but on that day a deposit was made of $10,296.41, leaving a credit balance of $441.95. That, however, the next day was checked out, and the account again overdrawn, until the 25th of October, when the overdraft was $6,767.58. On the next day, the 26th, a further deposit was made of $7,925.16, and on the close of that day there was a credit balance of $1,102.82; but on the next day sufficient checks were drawn on the account to create another overdraft of $3,071.16. And so the overdraft continued and increased until the 19th of November, 1906, when it was $12,-455.63. In the meantime, and on November 3, 1906, Page gave the bank three notes, all payable April 3, 1907—one for $3,000, one for $5,000, and another for $5,000; in all, $13,000. These were signed by Page alone, by signing, "H. D. Page, Page & Brinton." No claim is made that they were signed or delivered with the knowledge or consent of Brinton, or that Page had any authority to sign Brinton's name, or the firm name of Page & Brinton, except such as Page had in virtue of the partnership existing at the beginning, but which on May 22d, with full knowledge of the bank, was dissolved, and Page after that authorized to use the name of Page & Briton as and for only his own and individual purpose. The amount of these notes, so executed by Page alone, was, on the 20th of November, placed to his account, which he also continued to carry in the name of Page & Brinton, and was given credit therefor, which thus extinguished his overdraft and gave him a credit balance of $497.21. He, however, continued to overdraw his account until the 3d of December, 1906, when his overdraft again was $8,389.17. In addition to that, there was still the $2,000 note, Exhibit E,

and the $13,000 notes, which Page gave in November, outstanding and unpaid. And so the account goes on until the 14th of February, 1907, when it, with further deposits made in the meantime, showed, as testified to by the bank's officer himself, a credit balance, in Page's favor, of $3,115.35. That, of course, and also as testified to by the officer, included on the credit side the $13,000 notes executed by Page and the $2,000 note, Exhibit E, of Page & Brinton, given in May, 1906. That is to say, on that day the bank, as to the state of the account, was debtor to the amount of $3,115.35, and as against this was creditor to the amount of the $2,000 note, Exhibit E, and the $13,000 notes given by Page. So, on that day, the bank, as I read the record and the testimony of its officer, deducted from that credit balance of $3,115.35 the $2,000 note, Exhibit E, and marked and stamped the note "Paid," and surrendered and delivered it to Page. Now the argument is that that was not payment, because, when the amount of the outstanding notes is considered and compared with the credit balance, Page, or Page & Brinton, were debtors to the amount of nearly $12,000, and not creditors. That is true. Still the bank then could have applied that credit balance to the $13,000 notes, or could have held it subject to checks, or could have applied it, as I think it did, to the $2,000 note, Exhibit E, which then was canceled and surrendered.

In this connection it is also to be noticed that on February 6, 1907, Page, as Page & Brinton, executed still another note for $5,000, due one month thereafter. Then, on April 3, 1907, he, as Page & Brinton, executed another note for $3,000, one for $5,000, and another for $5,000, all due July 2d; on April 4th, one for $2,000, due July 3d; on April 6th, one for $5,000, due July 5th; on the same day another, for $5,000, due July 5th; still another on the same day, for $5,000, due July 5th; and on April 25th, one for $1,000, due June 25th— a total of $31,000. No claim is made that any of these notes were executed with the knowledge or consent of Brinton, or with his authority, except such as is claimed Page had in virtue of the original partnership. The $13,000 notes executed by Page in November, 1906, and the $5,000 note Feb-

ruary 6, 1907, were, by the bank, also marked and stamped
"Paid April 11, 1907," and were then surrendered and de-
livered to Page. Page continued to do business with the
bank, and between August, 1907, and February 8, 1908, as
Page & Brinton, executed nineteen other notes, aggregating
$83,000. These, as the others, were also executed without
the knowledge, consent, or authority of Brinton. The notes
executed in April of that year, aggregating $31,000, were by
the bank marked and stamped "Paid," some "May 28,
1907," some "July 2, 1907," the rest "July 5, 1907," and all
surrendered and delivered to Page. Between February 24
and March 28, 1908, Page, still continuing business with the
bank as Page & Brinton, executed eight other notes, aggre-
gating $43,000. These also were executed without the knowl-
edge, consent or authority of Brinton. The notes, aggregat-
ing $83,000, executed between August, 1907, and February 8,
1908, were all, by the bank, marked and stamped "Paid" on
various dates from November 27, 1907, to March 23, 1908,
and all surrendered and delivered to Page. The notes aggre-
gating $43,000 were not paid; that is, the amount the bank
claims it had advanced the firm of Page & Brinton, and
which remained unpaid.

Now it is contended that the original $2,000 note, Exhibit
E, was in fact not paid, but was either included in the $5,000
note executed by Page February 6, 1907, or was the $2,000
note executed by him April 4th, or was included in some of
the other notes executed by him in April, 1907; this princi-
pally because Page at that time, and at all times prior thereto
and after he had opened the account with the bank, was its
debtor greatly in excess of that amount. There is no doubt
that the notes executed by Page in April, 1907, aggregating
$31,000, were in part renewals of other notes executed prior
thereto, as were also the notes executed thereafter in part
renewals of notes prior to that time. But I am unable to
ascertain, on the record, that this particular note was so
renewed, or carried, or paid. The bank's officer, who, better
than any one else, knew what the fact in such respect was,
did not testify that that note was paid by another or others.
He testified that some notes were paid that way; but as some

were paid, stamped, and returned, by charging them against
the account and deposits of moneys and drafts Page obtained
from the Government as the work progressed, and others
marked "Paid" and returned because of other notes given
in lieu of them, he was unable to identify or segregate the
one from the other.  Still, as to this particular note, his testi-
mony was, not that it was paid by giving another note, but
that on February 15, 1907, Page had a credit balance of over
$3,000, and the Exhibit E was paid (not renewed) February
14, 1907, and after the payment (not renewal) of that note
"there was a credit balance of only $555.81."  Nowhere by
his testimony did he qualify the words "paid" and "pay-
ment," nor is it otherwise shown that he, by the use of them,
meant paid by a renewal or the giving of another note.  That
is left to argument and to inference.  Nor did he undertake
to explain, or point out, in what manner, or by what note,
Exhibit E was merely renewed, and not paid.  That again is
left to argument and inference.  If the bank's officer, and if
not he another familiar with the transactions and the account,
was not able to explain and point out with reasonable cer-
tainty in what manner and by what note Exhibit E was
merely renewed or carried in one or more of the several
batches of notes given thereafter by Page, and was still em-
braced or included in the last batch aggregating $43,000, it
is hardly to be expected that we can do that.  At least, in
view of the bank's stamp of unqualified payment, its sur-
render of the note, and of the testimony of its officer that
it was paid, the duty is cast on counsel to point out, and
show, on the record, what in such particular is claimed by
them.  This has not been done to my satisfaction.  Pointing
out that Page, during all the time of his account with the
bank, was its debtor greatly in excess of the amount of the
note does not suffice, for, manifestly, between the time the
$83,000 notes were given and the time the $43,000 notes were
given his notes from his drafts and deposits were reduced
nearly one-half; that is, about half of them were paid and
about half renewed.  Whether the $2,000 note, Exhibit E,
if not paid prior thereto, was included in the one or the

other, cannot be ascertained. The bank's officer seemingly was not able to tell, nor am I.

I know I may be in error as to that, and should hesitate, as I do, to overthrow the finding of non-payment of the trial court. But this is a case in equity, and an appeal on questions of both law and fact. On such an appeal, with proper assignments, as here, the litigants are entitled to a review of the record, and to our judgment, not only as to mere questions of law, but of fact as well. As to the latter, our power and duty in a law case are restricted to a mere review and consideration of whether there is any sufficient evidence to support a verdict or findings assailed. But in equity they are broader than that. Our views as to this are stated in the case of *Campbell* v. *Gowans,* 35 Utah 268; 100 Pac. 397; 23 L. R. A. (N. S.) 414; 19 Ann. Cas. 660. If here there were a conflict in the testimony respecting the question of whether Exhibit E had or had not been paid, and what the truth was concerning it depended upon the credibility of witnesses or the weight to be given to their testimony, I should not hesitate to approve the finding. I, however, do not find any substantial evidence to support it, and what I do find requires a contrary finding.

The proposition may be looked at from still another view. As already observed, I think it clearly shown that the partnership of Page & Brinton was dissolved May 22, 1906, and that Page thereafter carried on the business in his individual capacity—while under the firm name, still with the bank's full knowledge as to that. That was shown, not only by the testimony of Page and Brinton, but also by the bank's officer. The bank thus knew that Page had no authority after that, either as a partner or otherwise, to execute notes binding Brinton for advances made to Page in carrying on the business in his individual capacity. Because of that knowledge of the bank, the fact that Page, after the dissolution, signed the notes "Page & Brinton," added nothing whatever to his individual liability. If, now, it be true that the $2,000 note, Exhibit E, a partnership note, was paid and surrendered by Page giving his own note for it, then why is not that, as to Brinton, who did not authorize the giving of the new note,

payment of Exhibit E? Certainly, one note may be paid by another, if the parties so intend it, and if given for such purpose. The bank could have surrendered the partnership note, Exhibit E, for Page's individual note and obligation. It is not the question whether it would naturally do that, or whether it was wise to do it. The question is, if Exhibit E, as claimed by the bank, was paid by the giving and the acceptance of another note, was not that just what the bank did? It of course contends that Exhibit E was paid by the giving and the acceptance of another note on the theory of a continuing existence of the partnership, and hence all the notes, partnership notes and all, to the extent of $15,000, secured by the deed. But if it is wrong as to its two main contentions, the purpose for which the original notes and the deed were given and the continuing existence of the partnership, then is there nothing left to its claim that Exhibit E was paid by the giving and acceptance of another note. For, if those propositions are found against it, then does it follow that the notes given by Page after the dissolution were his individual notes, and nothing more; and if Exhibit E was paid by the giving of another note, then does it further follow that it was paid by the individual note of Page. And thus, with both of those propositions found against it, if Exhibit E was not paid in manner testified to by Page and the bank's officer, I do not see how the bank's position is bettered by the claim that Exhibit E was paid by the giving and acceptance of another note, for that, as is seen, but leads to the conclusion that it was paid by the giving and the acceptance of Page's individual note. If the bank is right as to its two main contentions, then is it entitled to a foreclosure for the full amount of the original $15,000 notes; if wrong, then to none.

I see no room for any middle ground, by claiming that Exhibits C, D, F and G were paid, but that E was not. Either all were paid, or none was paid; and as to that, and for the reasons stated, I think the record requires a finding that all were paid.

FRICK, J.

I concur. In view, however, of counsel's insistence that our original conclusion is erroneous, I feel constrained to add a few words.

I have never entertained a doubt respecting the correctness of the conclusions reached in the original opinion, and that those conclusions strictly conform to both the law and the facts. In my judgment the following questions were the only ones involved in the case: (1) To what amount did the firm of Page & Brinton become obligated in the mortgage signed by Brinton and his wife? (2) Was said partnership dissolved, as contended by Mr. Brinton? (3) Was the $2,000 note, Exhibit E, paid, as contended by both Page and Brinton?

The first question was perhaps one of mixed law and fact. In so far as it was a question of law, I never entertained any doubt with regard to what the construction of the mortgage should be, and that the construction placed thereon by the Chief Justice is the correct one. So far as it was a question of fact, the trial court found against the contention of the bank, and, in my judgment, correctly so. That the firm of Page & Brinton was dissolved, and that the bank knew of the dissolution, and also knew that Brinton, without his consent, express or implied, could not thereafter be held for any sum in excess of the amount stated in the mortgage, are established beyond a reasonable doubt.

The only question that remains, therefore, is whether the whole amount stated in the mortgage, and as evidenced by the note, Exhibit E, was paid. That question is so thoroughly disposed of by Mr. Justice STRAUP that I do not feel called on to argue the matter further, except to say that, when a creditor and holder of a note marks it "Paid" and surrenders the evidence to his debtor, the former, in case he wants to dispute the fact of payment, should be prepared to show by some clear and convincing proof why the evidence of payment he himself furnished, at a time when there was no dispute, nor likely to be one, concerning the fact of payment should not be taken as true. In this case the

bank has utterly failed to make such proof. All that are offered in that regard are certain inferences, which, in my judgment, are by no means conclusive in favor of the bank's contention, but may as readily be construed in favor of Mr. Brinton.

The petition should therefore be denied.

